

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

FEB - 1 2016

ARTHUR JOHNSTON
BY_____ DEPUTY

## IN THE UNIED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

Shanshan Zhan                                          **PLAINTIFF**

**VS.**                    **CIVIL ACTION NO. 3:14cv777-CWR-FKB**

**University of Mississippi Medical Center (UMMC)**        **DEFENDANT(S)**

## PLAINTIFF'S MEMORANDUM BRIEF IN SUPPORT OF RESEPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PARITIES AND STATUS OF LITIGATION

Plaintiff, shanshan Zhan, pro se, was Scientist I in Pharmacology & Toxicity dept of

UMMC from 02/06/2012 to 08/09/2013. UMMC is the defendant who is represented by

attorneys - Tommy Whitfield and Robert V. Greenlee from WHITFIELD LAW GROUP,

PLLC. Currently Plaintiff is to pursuit Title VII of the Civil Rights Act of 1964 (42

U.S.C. 2000e et seq.) and Equal Pay Act to redress Defendant's unlawful employment

practices including not equal pay, a wrongful termination and discrimination on the basis

of her race (Asian). Plaintiff is seeking for monetary compensatory from UMMC.

### FACTS

The undisputed facts are as follows:

**1. Plaintiff was unequally underpaid and disqualified through a false job**

**representation and fraud in the recruiting process with racial prejudice by UMMC.**

Plaintiff and Dr. Didion (Associate professor of Pharmacology & Toxicity department,

Plaintiff's ex-boss) used to work in the VBC department of Georgia Health Sciences

University (currently named Georgia Regents University). After having learnt Dr. Didion

got two RO1 funding from NIH and was accepted by UMMC, Plaintiff started to contact

Dr. Didion for discussing possibilities to work in his lab in June of 2011 by emails and personal meetings. From those meetings, he told Plaintiff like her background in the dept of UMMC got about $60,000 pay annually. Dr. Didion invited Plaintiff to UMMC in October, 2011. During the visiting, he told Plaintiff that he would give her Research Scientist position. Research Scientist position in Plaintiff's previous institute is non-tenure tracked faculty position. Plaintiff thought that's a faculty position for her. Dr. Didion never told her about Scientist I position. It turned out that there isn't named Research Scientist position in UMMC. After the visiting, he soon called Plaintiff and told her if she joined his lab, she was about to be a leader of Alzheimer's study group, also he could help her to be a director in the dept in the future. Meanwhile, from production of discovery provided by UMMC, Dr. Didion emailed Mr. Kevin Wilbert (Director of Operation Office of Pharmacology & Toxicity dept) to **make a false statement about Plaintiff's previous position "Dr. Shanshan Zhan is listed as a post-doc, but really is a research assistant.. I would like to hire her in around $38,000-45,000 .. " Mr. Wilbert replied " I will begin to work on this for you.** (Exhibit 1) " Research Assistant requires bachelor degree maximally in Plaintiff's previous university. In order to disqualify and underpay Plaintiff,  Mr. Wilbert and Dr. Didion ignored a verification of Plaintiff's previous post-doc position obtained by UMMC HR (Exhibit 2). Later, Plaintiff asked an offertory letter from him for several times through emails ( UMMC never provided them), he always made some excuses to refuse to give her and telling her he was so concerned if she wouldn't really come to his lab, unless she quit the job. Plaintiff was very naive to think no reason not to trust him, because of her strong background and his big words like "group leader" "director in the future", etc. As soon as she quit the job,

he emailed  Mr. Wilbert again to lower the pay range " **I have attached a copy of her CV and would like to get her  in somewhere in the $35,000-$40,000 range as a Scientist I..** (Exhibit 3)" Later, he emailed an offer to her. It's very shocking to Plaintiff that job title and salary were totally different from their discussion, but she already quit her job left her no choice she had to apply for whatever it was., because she is a single and no other financial resources. In his email he only described job duties but without job eligibility and other job information (UMMC not provided). Plaintiff followed his instruction to apply for the job listed on UMMC webpage, there was missing "Posting Details" with job information such as background requirements and job duty for the position, but only showing application forms (Exhibit 4). Every listing job contains "Posting Details" on UMMC job webpage (Exhibit 5)**.** From documents of production, there is a sheet of Job Code 3770 - SCIENTIST I, dated 10/4/2011 with somebody's notes (Exhibit 6), which showed Minimum Requirement: M.D. plus Master's degree with no experience or MD or PhD, with one year experience, etc. **Plaintiff never saw this sheet on the listed job webpage when she was applying and the sheet was not web listing format.** Plaintiff has MD and PhD degrees with post-doc experience more than 10 years plus research associate and lab manager experience about more than 15 years only in USA, not accounted for other countries (Exhibit 7), which fits in Scientist IV (PhD/MD + 10 years experience) from HR hiring guideline (Exhibit 8). In addition, Scientists from other labs in the same dept with less experience and lower degree than Plaintiff's were Scientist II - IV. There were 10 Scientist I people in UMMC during the period, but in Dr. Didion's lab and the dept there was only plaintiff (Exhibit 9). The salary range for Scientist I is minimal $38,240, Middle $ 47800, Maximum $ 57,360.

| Name | Age | Salary | Race | sex | Dgree |
|------|-----|--------|------|-----|-------|
| Ball, Jana P | 29 y/o | $38,240 | White | ? | ? |
| Kaizaki, Asuka | 33 y/o | $39,520 | Asian | ? | ? |
| Zhang, Junlin | 35 y/o | $38,300 | Asian | ? | ? |
| **Zhan, shanshan** | **62 y/o** | **$39,998** | **Asian** | **F** | **M.D., PhD** |
| Sudharshanam, Karakala | 36 y/o | $44,720 | Asian | ? | ? |
| Bandyopadhyay, Sibali | 39 y/o | $47,800 | Asian | ? | ? |
| Liu, Huiling | 42 y/o | $46,322 | Asian | ? | ? |
| Moulana, Mohaddetheh | 49 y/o | $43.493 | White | ? | ? |
| Sirous, Zohreh | ? | $46,322 | Middle-Eastern | ? | ? |
| Quinet, Julie | ? | $44,532 | White | ? | ? |

From the table above, one can see Plaintiff with doctoral degrees and with her age got similar payment with those 29 - 35 years old people without degree and gender information. Suppose they had doctoral degrees, from their ages, how much work seniority they could have? **Were these Scientists I people paid equally between female and male? Why did not UMMC provide requested gender information to Plaintiff?** Plaintiff requested gender, age and education degree information for many times since initial discovery on 6/2/2015, but UMMC was non-responsive and never provided it. Defendant knows one Plaintiff's allegation is violation of the Equal Pay Act, therefore they intentionally did not provide the information. Bottom line**,** Dr. Didion and HR didn't fully disclose the position information to Plaintiff. He intended to deceive her falling into his trap to quit her job first and to misrepresent the job title and payment to her; also

made fraud in the recruiting process by making a false representation about Plaintiff's

previous job title to the director of the dept. He and  Mr. Wilbert never did these tricks for

other racial people in the dept during Plaintiff's employment time.

**2. Constitution of retaliation against Plaintiff in many ways for her complaints**

**about underpay and racial slurs in Dr. Didion's lab to the authorities of the dept**

**a. Denying Plaintiff's Promotion based on her race**

Joel Sarmiento was a Mexican  American employee with MS degree working in Dr.

Didion's lab from 11/7/2011 to 6/22/2012. He was promoted from Researcher I to II

around May, 2012 (Exhibit 10),  just after Dr. Didion hired two Researcher II of

American White people started on 4/30/2012. These two American White persons had

MS degree too, but had much less working seniority than Joel at their hiring time (Exhibit

11).

| Joal A, Sarmiento | Mexican  American | 33 y/o | 11/7/2011 to 6/22/2012 | M.S. |
|-------------------|-------------------|--------|------------------------|------|
| Nicholas L, Gillbert | American White | 24 y/o | 4/30/2012 to 1/10/2013 | M.S. |
| Bryan R, Gibson | American White | 28 y/o | 4/30/2012 to 6/15/2012 | M.S. |

Because the newly hired American White Researcher II became an apparent comparison

to Joel's Researcher I, Joel was quickly promoted after 6 months working in Didion's lab,

which showed Dr. Didion discriminated people for their title and payment intentionally.

After working with Dr. Didion for 6 months and more than one year, Plaintiff asked fair

pay and the right title for several times to Dr. Didion and Mr. Wilbert, because Plaintiff

was the only one titled Scientist I in the lab without any comparison, they  rejected her

for promotion. From Joel Sarmiento's case, it showed Dr. Didion treated American white

better than Mexican American by title and payment, but really discriminated Plaintiff as an Asian. For e.g. Dr. Didion didn't justify her payment and her title by saying to her that he paid his former employee - Ms. Chen with 25 year experience like Plaintiff originally from China for only $30,000 annually (Exhibit 12). He also admitted to Plaintiff:" Regarding to your current title, it's lower than your background, but I don't want to do any paper work for you to change it, because you haven't served for me long enough" (Exhibit 13). This showed his attitude to Plaintiff as a slave. Dr. Didion told his colleagues with a proud that the new person with doctoral degrees and a lot of working experience originally from China he hired was just Scientist I. Chinese people were that cheap, which circulated in the dept with lot of negative reactions. (Exhibit 14)

**b. Micromanaging to block Plaintiff to do her own projects, halting Plaintiff's publication and taking away Plaintiff's award of chemical compound**

On April 10, 2013, Plaintiff came to Jonathan Lee - technician to ask the mice list of her project assigned by Dr. Didion and emailed Dr. Didion that she needed 4 normal control mice to do experiments. Dr. Didion yelled at her for talking with Lee, taking away Plaintiff's working folder without her permission, stopped her doing the project and had two meetings with Mr. Wilbert who really didn't understand what's going on. So at meetings Mr. Wilbert suggested : "shanshan you should work actively with Jonathan Lee", which was in the opposition of Dr. Didion's standpoint (Exhibit 15). When Plaintiff's submitted abstract was accepted for Hypertension Conference poster presentation and publication in July, 2013, Dr. Didion oddly ordered Plaintiff to take off his senior author name from Plaintiff's abstract and refused to pay the registration fee (Exhibit 16). Plaintiff was granted for a chemical drug from a Swedish pharmaceutical

company to do clinical trial study on culture cells, which Chairman Dr. Roman and Dr. Didion himself supported. However, Dr. Didion never set up a date for UMMC biohazard officer to inspect the cell culture room requested by biohazard committee (Exhibit 17). Therefore, Plaintiff couldn't proceed to do the study. On the termination day, Plaintiff was told by Ms. Keefer - HR Academic Business Partner that the chemical compounds would be taken over by Dr. Didion.

**c. Assign unbearable job duties to Plaintiff, bully Plaintiff to sign it , and refuse to give  hard copies of the papers Plaintiff signed, later make fraud sheets of evaluation and job description.**

On June 13, 2013, Dr. Didion, Plaintiff and Mr. Wilbert had an evaluation meeting for Plaintiff. Dr. Didion showed the evaluation sheets with high performance box checked at lab work, but in comment section he wrote Plaintiff was not a team player with his two PhD students Jessica Faulkner and Jessica Gomolak. Dr. Didion also handed a sheet of job description for the next academic year to her and ordered her to sign it. In the sheet, he listed  more than ten technique terms of molecular biology and biochemistry that she should teach his PhD students, post-doc and technicians; publish at least 4 papers within a year, 3 out of 4 papers should be peer-reviewed; and in every lab meeting once a week she must provide 2 new research ideas, etc. Obviously, no one could achieve, especially for Plaintiff being micromanaged to block her projects and her publication. Dr. Didion's publication record showed total 5 papers published as the first and senior author between 2007-2012 on NIH med-line webpage. When she asked to talk to Dr. Roman (Chairman) about it, Dr. Didion immediately said:"from now on, you couldn't talk to Dr. Roman. That is a special rule to you." He forced her to sign it by saying "do you want to keep

your job?". She was bullied by him and signed it. But he refused to give Plaintiff copies

of her evaluation sheets and the job duty description sheet (Exhibit 18). From production

of discovery there are evaluation sheets for Plaintiff with a negative review different from

the one Plaintiff signed and with a HR Memorandum for this evaluation (Exhibit 19),

telling that **"The 2012-2013 Annual Evaluation written by Dr. Sean Didion in**

**Halogen was never submitted, therefore the employee never saw this evaluation."**

There is also a sheet tiled "2013-2014 Research Scientist Definition and Expectations for

Shan Shan Zhan PhD" with Plaintiff's signature and dated on 6/13/13, which is on CD

disk provided by UMMC (Exhibit 20). **Plaintiff never saw and signed this sheet.**

UMMC never provided the authentic original **job description** sheet Plaintiff signed on

6/13/2013. On 07/10/2013, Dr. Didion came to Plaintiff's bench to hand a sheet titled

"2013-2014 Research Scientist Definition and Expectations for Shan Shan Zhan PhD" to

her (exhibit 21), the contents of the sheet was different from the one above as Exhibit 20.

She didn't sign it because there was not any job title as Research Scientist in UMMC. It

was the title he tricked her to lowball her in the first place and now he played this game

again to her. Having seen she didn't sign it, he said to her: "you are very smart that you

don't buy it." (Exhibit 22) Plaintiff kept the unsigned sheet.

**d. HR & dept organized partial lab people but left out all Asian people to write**

**complaining letters with defamatory and false statements against Plaintiff just the**

**day before and on Plaintiff's termination day to retaliate her reporting of racial**

**slurs.**

On the evaluation day of 6/13/2013, Plaintiff told Dr. Didion and Mr. Wilbert that it's not

totally her fault, if Dr. Didion thought she was not a team player with her two Jessica

PhD students. Actually, Plaintiff was popular in the lab, because everyone came to her to ask help for their experiments and almost every lunch she shared time with the lab mates including American white, India, and American black people. But two Jessica didn't like her from very beginning and had some attitudes towards her. She gave some examples to Dr. Didion and Mr. Wilbert about their racial slurs to Asian people in the lab, like Chinese steal; Asia women married white people in order to get rid of their Asian genes; Chinese chicks;  they didn't like foreigners except for Europeans, etc. Faulkner didn't respect Plaintiff by stripping off her doctoral degree mark and put her name in technician section from her dept presentation slides. They shouted at Jing to stop her time-point experiment, because they wanted to use the machines to do theirs immediately, and Gomolak screamed at Plaintiff from her back to order her teach how to design the gene primers, etc (Exhibit 23). After Plaintiff complaint, Dr. Didion and Mr. Wilbert didn't say anything to her and latter never talked with her about these issues.

From the documents of discovery, there are five complaining letters against Plaintiff from Dr. Didion, Jessica Gomolak, Jessica  Faulkner, and the sisters of Leslie & Alexia Miller (Exhibit 24). Dr. Didion & Jessica Gomolak's letters dated on 8/8/2013 (the day before Plaintiff's termination day), and the others not dated. At Jessica Faulkner and Leslie Miller's deposition, they admitted that they were called by Dr. Didion to Mr. Wilbert's office where they ordered them to write and instructed how to write the letters on Plaintiff's termination day (Exhibit 25). Faulkner's deposition  proved that a lot of complaints in her letter were false. For example, she wrote: "She (Plaintiff) has habitually lied about many things, including people in other labs saying things to her or messing with her experiments that it was revealed later never happened. On a personal note, she

has expressed to me over the last 1.5 years dislike for each person in the lab, particularly Dr. Didion. **She refused to provide assistance to anyone, anything she orders for the lab, including equipment.. . She has refused to help me with procedures, and trouble shooting...**" In her deposition, she admitted whenever she needed help like how to do experiments, trouble shooting, experiment procedures and some equipments from Plaintiff, Plaintiff always provided help immediately and never refused. She also admitted that several issues in her letter had been actually resolved between her and Plaintiff before. She couldn't name any one and incident in other labs Plaintiff complained written in her letter (Exhibit 26).

**e. Plaintiff was terminated maliciously with using excessive force**

On August 9th, 2013, Plaintiff's position was eliminated under Reduction in Workforce. Plaintiff didn't get any notice in advance and was ordered to leave the lab within minutes. She wasn't allowed to access her working computer to clear it up, not allowed to say goodbye to her coworkers, and  hardly to take all personal belongings (a few things are still in UMMC). Her UMMC email account was closed right away. She must hand in her badge and keys immediately. Two HR women escorted her to the hospital part and verbally told her "You are not allowed to come back the research building in future without saying conditions." Mr. Wilbert forbid Plaintiff talking with coworker Jing Li in the lobby of the main hospital. On August 12th, 2013, 3 days after the termination, Plaintiff **as a free USA citizen** wanted to meet with some faculty friend talking about job seeking in other departments of UMMC and to see doctors. She went to Ms. Barbara Smith Watson (HR relation director)'s office first to complaint about her termination and asked Ms. Watson if she could go to physiology dept to meet with her faculty friend and

to see doctor. Ms. Watson answered that she could go to Physiology dept but just did not go back to the old dept where she used to work (Exhibit 27). Plaintiff ran into Pamela Banks (Administrative assistant) in the hospital hallway and telling her she was on the way to the break room of Physiology Dept meeting with a faculty friend and later she would go to see her dentist. At Ms. Banks' deposition she admitted that she reported to Mr. Wilbert about Plaintiff where she would be. Plaintiff was in the break room of Physiology Dept waiting for the faculty friend who was fetching his lunch, 3 or 4 armed security guys showed up forcing Plaintiff to leave UMMC property immediately and forbidden her to see doctor. **On the way to the parking lot,** Plaintiff turned into the HR director's office to see Ms. Smith Watson, **she didn't dismiss security guys instead she still used security force to send Plaintiff to the cafeteria of the hospital without mentioning if Plaintiff could see doctors.** From the record of Mr. Wilbert's phone call to the police dept that **"Plaintiff was fired and was told not to come back on campus....subjected to be escorted off the campus"** (Exhibit 28), **which showed the directors of UMMC did not RIF Plaintiff, actually fired Plaintiff maliciously, also they abused power to use excessive force to violate a free USA citizen's civil rights.** Mr. Wilbert admitted in his deposition that he never physically saw Plaintiff where she was and whom she met with, but got message from Ms. Bank. The question is as a director, Mr. Wilbert didn't come to Plaintiff to ask her why she was there, instead using excessive force, which showed he took personal mean to abuse Plaintiff without professionalism and at least not in Good Faith. If Plaintiff were a white person, would he dare to do this without even blinking his eyes? When Plaintiff showed the phone record of Mr. Wilbert's to Ms. Smith Watson at her deposition, pointing out "she was fired", Ms.

Smith Watson said RIF was considered as termination. She also said " What's the deal? Why could he not call? What was wrong with his calling?" (Exhibit 29) As HR director even didn't care what's the difference between Fire and RIF and even didn't know a USA citizen's civil right? Ms. Smith Watson showed her arrogant and prejudicial attitude to RIF Plaintiff without professionalism and dignity. UMMC never provided the policy for managers to use police force as requested.

**3. UMMC not following / violating own RIF policies and procedures**

**a.** UMMC riffed Plaintiff maliciously, discriminatorily (the way of her RIF never happed to other racial people),  humiliating her personally and without an advanced notice, which did not follow UMMC own RIF policies. From RIF guide of UMMC (Exhibit 30), the policies say: **1. There will be consistency of employment practices during the transition phase. 2. Decisions concerning staffing will be determined by using non-discriminatory criteria. 4. We will treat employees with professionalism and dignity. 7. for those employees whose positions are eliminated, UMMC will provide at least a 30-day notice.** From the deposition of Ms. Smith Watson, Plaintiff asked her why she was Riffed differently from other Riffed people even in the same dept. Dr. Roman (Chairman) gave his Riffed person named Andy 90 days notice in 2013. His email account remained 3 months after the day he left and he could come to the campus free to see doctors and to come back the old dept to meet with his spouse. Ms. Smith Watson answered that **"Maybe  Dr. Roman was wrong in doing that."** Plaintiff said that "every lab did same, but Plaintiff was exception." Ms. Watson answered: " Okay." (Exhibit 31) She has never provided requested so called correct RIF protocol to Plaintiff. Moreover, as a director of HR what is "Maybe" saying about a Chairman of the dept, which is so

unprofessional and arrogant. Ms. Keefer verbally told Plaintiff not come back to the research building, Mr. Wilbert forbid her in the lobby of the main hospital and called police remove her off the campus with a reason that she wasn't allowed to appear on the campus, which made many coworkers call their actions as fascists. However, from Plaintiff's termination letter (Exhibit 32), RIF script (Exhibit 33) of her case, and all RIF policies, as well as employees' hand book of UMMC, there was not any word for Riffed people who are forbidden to visit their friends and appear on campus. In the opposite, Plaintiff still was "an active employee" in the writing of the RIF script. When Plaintiff repeatedly requested what rights and benefits as an active employee should have, UMMC never provided. All of these facts again showed the directors and managers treated Plaintiff not with professionalism and taking personal mean to her without dignity. **b.** Dr. Didion submitted only a "Revised Reduction in Force Proposal" (Exhibit 34) on 8/8 2013, the day before Plaintiff's termination day, and **he didn't set up "the expected date of notification and the expected date of termination",** which was missing a procedure as PROCEDURES OF UMMC RIF GUIDE No. 1 requested ( Exhibit 35). **c.** Dr. Didion & Mr. Kevin Wilbert did not check **RIF check list** out, and Plaintiff was not allowed to do "exit interview" on line, which was missing procedures of RIF and Faculty and Staff hand book (Exhibit 36).

**4. Missing / violating UMMC Employment Handbook procedures and legal laws**

**a.** When Plaintiff asked to speak to Dr. Roman (Chairman) about the job description sheet, Dr. Didion forbid her to do so, which violated the policy of PROBLEMS, QUESTIONS AND GRIEVANCES-STAFF in FACULTY AND STAFF HANBOOK of UMMC (Exhibit 37). **b.** UMMC did not do any investigation and remedy for Plaintiff's

complaint of racial slurs about Asian people, instead retaliated with defamatory letters against her and "fired" her, which was at least **NOT in GOOD FAITH. Reporting racial slurs and discrimination to employer's authorities is also protected by law.**

**5. Discrimination and Segregation  on the Basis of  Race - Asian**

Plaintiff's fraud hiring was based on her race. If Plaintiff were American white, Dr. Didion wouldn't dare to do so many tricks on her. Dr. Didion called Plaintiff "Chinese Mafia" over an accident that Plaintiff broke a glass cylinder and made Plaintiff apologize formally (Exhibit 38). Dr. Didion only took Plaintiff and Jing Li's notebooks without notice, which made them reporting to the dept for losses of working documents. After Jing reminded the white PhD student for forgetting to close the oxygen tank, Dr. Didion intimidated Jing by emailing her two options for her 1) get one oxygen generator 2) blank (no words). Dr. Didion didn't provide desk for Indian PhD student Rohini Bandaru for a long time but an American white PhD student came much later for rotation, on day one got a desk, after she left, the Indian PhD student took over her desk. Plaintiff asked a desk for several times, Dr. Didion never gave Plaintiff a desk but gave his American white PhD students desks in the lab also desks in the post-doc office, although they were not obtained PhD yet (exhibit 39). Dr. Didion and Mr. Wilbert frequently in the lab talking with the two American White PhD students, joking and laughing very loudly, sometimes flirting with them, which made other people in the same room very uncomfortable and some people called "Jessica corner" From UMMC orientations, all employees were told that if some people stay together talking and laughing loudly in the work place, but other people don't like it, these people shouldn't do it. Mr. Wilbert as a director of operation office came to the lab talking and laughing with two Jessica, which showed his

unprofessional behavior and he treated people differently. HR, Mr. Wilbert and Dr. Didion ordered four lab people to write defamatory letters against Plaintiff, two of them were sisters, but didn't ask any of the four Asian people's opinions in the lab. HR and the dept never let Plaintiff write down her complaints what she reported to Mr. Wilbert, which demonstrated a racial discriminating action from UMMC. Plaintiff's RIF was unprecedented and malicious in UMMC, which showed UMMC 's discriminatory attitude to Plaintiff as an Asian other than other racial people. Dr. Didion forced Jing Li to leave UMMC on 8/15/2013 6 days after Plaintiff's termination, although the paper work says the separation day is 9/27/2013. Someone went on the employee resign webpage (Lawson) to check out for Jin Li, which was violated UMMC procedure. HR ignored and didn't respond Jing Li's email to Ms. Smith Watson titled "asking for help" and refused to see her when she stopped by Ms. Smith's office (Exhibit 40). All these facts showed UMMC discriminated Asian employees from other racial people in UMMC.

**6. UMMC ordered all staff to leave Dr. Didion's lab due to Plaintiff's litigation.**

Alexia Miller told Plaintiff via a phone call on 10/21/2015 5 pm, that all lab people must leave Dr. Didion's lab in October, 2014 by UMMC's order due to Plaintiff's charging in EEOC and she signed a non-disclosure agreement with UMMC before she left in October, 2014. The agreement was about not revealing anything of Dr. Didion's lab and UMMC. During the deposition, when Plaintiff asked the deponents why they left Dr. Didion's lab, the attorney Mr. Whitfield always halted the deponents' answering by objections. Since October, 2014, Dr. Didion has not had any employees. If UMMC didn't think Dr. Didion had any wrong doing, it would not take any this kind of action to him.

**7. UMMC violated EEOC investigation policies and despised the jurisdiction.**

**a.** Until April 24, 2014, Ms. Watson started to respond EEOC investigation letter dated on 02/28/2014, later also delayed to provide documents to EEOC, which showed UMMC violated EEOC investigation response deadlines twice (Exhibit 41). Ms. Smith Watson made false statements to EEOC about the place and person Plaintiff's visiting on 8/12/2013 as well as UMMC RIF policies (Exhibit 42). **b.** In December, 2014, some one called Plaintiff introduced his name as Tommy Whitfield, asking Plaintiff's case. After Plaintiff described her case, he then said he was a defense lawyer. **c. On October 29, 2015, Mr. Whitfield called Plaintiff telling her that her case was officially over and she didn't need to do deposition anymore, because the Judge ruled out a dismiss of her case in the ruling of Defendant's partial summary judgment,** which was misrepresenting the Court and using very deceptive way to scare her away. **d.** UMMC has not provided emails between Plaintiff and Dr. Didion from August, 2011 to Feb. 1, 2012 including their discussions about offering to Plaintiff, and some other requested documents. The question is if you can retrieve an email on 11/23/2011 about Thanksgiving greeting to Dr. Didion, you should be able to retrieve other emails around that period. **e.** Defendant responded Plaintiff's initial discovery (6/2/2015) on 6/5/ to 7/1/2015, without UMMC managers' signature but only with the Attorney's signature, which violated Fed. Rule 33 (b) (5). After Plaintiff emailed Mr. Whitfield and Mr. Greenlee to point out this, on 7/27/2015, Defendant mailed Ms. Smith Watson's notary signature dated on 7/7/2015 (Exhibit 43). **f.** Plaintiff sent Good Faith Form to the defendant attorneys via both regular mails and emails on Dec.9, 2015, also through phone calls and emails to request signed Good Faith Form back on the deadline of Dec.14, 2015.

But the defendant didn't return the calls nor respond the emails, which violated Luc.

Court. Rules. 37 (a).

## DISPUTE  DEFENDANT"S SUMMARY JUDGMENT POINTS

### To Defendant's FACTS page 3 on line 6 –

Defendant wrote: "Prior to her accepting the job at UMMC, Plaintiff was a Post Doctoral

Associate at Georgia Health Sciences University where she had an annual salary of

$33,999,96." In bioscience field, "Postdoc position" is for a doctoral person who gets

his/her own Postdoc fellowship from NIH and must follow NIH payment standard. In

2007 -2011, the Postdoc payment range of NIH from first year to five years is about $

37,000 to $46,000. "Postdoc associate" position is for a doctoral person who doesn't have

a Postdoc fellowship of NIH and is paid under the boss's funding. Therefore, it does not

impose to follow NIH standard, which could cause chances to take advantage of

employees. However, Plaintiff's case is about UMMC. The career path in this field is that

all Postdoc people are looking for faculty, research scientist and industrial jobs. If they

can get faculty positions or industrial jobs, their salary would jump higher from 60% to

300%, which is a common sense to people in the field. Dr. Didion experienced the same

way so that he used the psychology of Plaintiff seeking a faculty position to

misrepresented  about a position of Research Scientist - non-tenure tracked faculty with

about $60,000 salary to her. Defendant has no legitimate ground  to mention Plaintiff's

previous position and salary.

### To Defendant's - The Reduction in Force, Page 4-6

From Plaintiff's fact page 11-16 mentioned above, Plaintiff described the details how she

was maliciously Riffed without dignity and a 30 days notice, and how UMMC violated

it's RIF policies and procedures. Especially, Dr. Didion submitted his RIF proposal without **"the expected date of notification and the expected date of termination"** that were requested by UMMC RIF PROCEDURES on 8/8/2013, and Ms. Smith Watson immediately approved on the same day. On the following day, Plaintiff was forced to leave the lab within minutes even was not allowed to say good-bye to her coworkers The termination letter wrote that Scientist I, will be eliminated effective September 9, 2013. Effectively immediately, you will no longer be required to work ... During this notice period, you will remain on the UMMC payroll...will retain all benefits .." In reality, UMMC took away Plaintiff's badge, keys and closed her UMMC email account immediately (all other Riffed employees' email accounts remained 3 months after their separation day), even forbid her to appear on campus. **Is this a 30 days advance notice or "immediate firing"? Is this remaining all benefits for her? Is this followed UMMC RIF policies: 1. There will be consistency of "employment practices" during the transition phase. 2. Decisions concerning staffing will be determined by using non-discriminatory criteria. 4. We will treat employees with professionalism and dignity. 7. for those employees whose positions are eliminated, UMMC will provide at least a 30-day notice." Is this the same way to Riff all other racial employees of UMMC?** Therefore, no wonder, a lot of employees in the dept who witnessed Plaintiff's termination were scared and questioning " Is this USA or dictator fascism?" Defendant mentioned that "Per the reduction in force proposal, the duties performed by the Plaintiff were to be absorbed by the Postdoc Fellow I position, **which at the time was occupied by Jing Li, an Asian Female.**" Jing Li was forced to leave UMMC on 8/15/2013 6 days after Plaintiff's termination, but from UMMC paper work the separation day was

9/27/2013, which played a same game as to Plaintiff. At the end of August to the beginning of Sept. 2013, Jing expected to collect her mice experiment results. She asked Dr. Didion if she could leave on 9/27/2013 as they both agreed before in order to get the results, but he insisted to force her leave on 8/15/2013. Jing Li's experiments were time-point related and mice already were operated, which nobody else could do the surgery even Dr. Didion himself. The mice are very expensive, for a normal mouse, it costs $8+ even not accounting the cost for drug, surgery and breeding time, etc. Dr. Didion was playing racial discrimination causing the money already spent for the experiments down to the tube without collecting the results, which showed how he wasted tax-payer's money.

**To Defendant's "The Lab Manager Position" page 6-7**

Defendant's main point is that Plaintiff didn't apply for the Lab Manager position listed on UMMC job webpage on 8/20/2013. This position was opened by Dr. Didion. In his RIF proposal, his reason for eliminating Plaintiff's position was to replace it by a lab manager for another person. Furthermore, after Plaintiff was maliciously "fired" and with excessive force to forbid her appearing on the campus, is there anyone in the world who possibly would think Plaintiff would apply for anther job in UMMC? This is exactly what Dr. Didion and UMMC wanted to humiliate and bully her intending to scare her not to work in UMMC any more. In addition, they ordered partial lab people to write defamatory letters the day before and on the day Plaintiff terminated "just for the records" as Mr. Wilbert's said in his deposition (Exhibit 44 - line 7 to 10), which showed their intention to destroy Plaintiff's reputation forever. Suppose Plaintiff apply for a job in UMMC again, UMMC could easily take out the letters as reasons to reject her application.

Therefore, this is exactly Plaintiff's damage claims that UMMC destroyed Plaintiff's job seeking permanently and Plaintiff was so scared to see doctors until almost 3 months later she went to UMMC clinic and found out she had breast cancer.

**To Defendant's "Department Demographics"**

Defendant's table for Scientist I of UMMC showed no education degree, working seniority, **gender information** and incomplete age information, therefore, it represents no legitimate ground to draw any conclusion from it. From the demographics of Scientist I -IV in the Pharmacology dept, they were largely Asian and it looks no Asian discrimination. That is true except for Plaintiff - Zhan, Shanshan Scientist I. They were in different labs and Plaintiff who had higher degree and more seniority than all of the other four was only Scientist I given by Dr. Didion, which demonstrated Plaintiff was not fairly treated by him. How Dr. Didion discriminated her with payment and the title based on her race has been described in Fact section above. Most importantly, even though 99% employees of UMMC showed no racial discrimination for payment and title, some single racial discrimination case in some individual lab happened like Plaintiff's case shouldn't be neglected and be excluded. Thereby, it can't draw a final conclusion from A Department Demographics. Like Plaintiff's case, if UMMC had been in GOOD FAITH to resolve Plaintiff's complaints or RIF her just following RIF policies and procedures, Plaintiff would have never pursued any legal actions. However, after her complaint about underpay, racial slurs and mistreated based on her race, HR and the dept retaliated her, humiliated her and abused her in many ways. Therefore Plaintiff got a prima facie case.

**To Defendant's "ARGUMENT"**

Plaintiff is pro se and almost no professional knowledge of the law. However following Defendant's argument points, Plaintiff definitely has a strong prima facie case.

1. Plaintiff is Asian 2. Plaintiff was hired through a misrepresenting of job information, non fully disclosure of job listing and fraud to disqualify her to underpay her. This hiring fraud didn't happen to other racial people in the same period. From Joel A, Sarmiento's promotion, soon after he had two white comparators in the lab he was justified by job title with 6 months working in the lab. Plaintiff didn't have comparator in the lab, therefore she was rejected to be justified by saying that Dr. Didion's previous Asian female employee with over 25 years experience only got $30,000 payment, which showed Dr. Didion and HR played the law around to discriminate Plaintiff as Asian. 3. Due to Plaintiff's complaints about underpay and **racial slurs to the dept authorities** that is protected by law, she was maliciously "fired" and even forbidden to appear on the campus with excessive force removing, which never happened to other racial people. 4. UMMC forced Jing Li - Asian (inside of Plaintiff's protected class) leave UMMC six days later after Plaintiff's termination, which was exactly an opposite to Dr. Didion's RIF proposal "have those duties absorbed by the Postdoc Fellow I position." It demonstrates that Dr. Didion and HR deceptively and intentionally played  paper work to conceal their discrimination motive and action. One month later on 9/16/2013, a white person (outside of her protected class) named Alyssa Bailey was hired as a lab manager for replacing Plaintiff Scientist I position as Dr. Didion RIF proposed. She was 32 years old with MS degree. Based on UMMC's failure to provide the requested her salary information, it raises a possibility that she was paid higher than Plaintiff. Therefore, this scenario is another fact to exactly fit racial discrimination case.

**To  "Equal Pay Act" page 20**

Plaintiff was issued a Notice of the Right to Sue UMMC under **"Equal Pay Act"** by

EEOC, however, she did not understand the law and she did not have evidence to prove

violation of UMMC, except for the evidence she was underpaid discriminatively on the

basis of her race. After reviewing the documents of the discovery and demographic  of

Scientist I lacking of the gender information, Plaintiff is still standing on this pursuant.

The information of  Scientist I is presented as the table below from UMMC provided data

**(Exhibit 9).**

| Name | Age | Salary | Race | sex | Dgree |
|------|-----|--------|------|-----|-------|
| Ball, Jana P | 29 y/o | $38,240 | White | ? | ? |
| Kaizaki, Asu | 33 y/o | $39,520 | Asian | ? | ? |
| Zhang, Junlin | 35 y/o | $38,300 | Asian | ? | ? |
| **Zhan, shanshan** | **62 y/o** | **$39,998** | **Asian** | **F** | **M.D., PhD** |
| Sudharshanam, Karakala | 36 y/o | $44,720 | Asian | ? | ? |
| Bandyopadhyay, Sibali | 39 y/o | $47,800 | Asian | ? | ? |
| Liu, Huiling | 42 y/o | $46,322 | Asian | ? | ? |
| Moulana, Mohaddetheh | 49 y/o | $43.493 | White | ? | ? |
| Sirous, Zohreh | ? | $46,322 | Middle Eastern | ? | ? |
| Quinet, Julie | ? | $44,532 | White | ? | ? |

If UMMC thinks that there is no any dispute for gender issue, please provide the

information of **gender** to prove. If Defendant refuses to do so, that would be a pitfall of

its arguments and Plaintiff should have a chance to meet with the Judge and at trial to clarify.

**CONCLUSION**

Defendant's summary judgment is no legitimate ground to dismiss Plaintiff's prima facie case with undisputed facts. The main reasons are:

1. Defendant ignored and avoided of Plaintiff's facts of her fraud hiring process to underpay her with racial prejudice; racial discrimination including racial slurs in the lab; unequally treated people based on race; the managers of the dept and HR retaliated Plaintiff for her complaints about racial slurs and underpay by using "firing" means to Riff her with multi-violation of UMMC RIF policies, Faculty and Staff Handbook policy and the civil laws, which indicates Plaintiff has undisputed facts and Defendant has no arguments for them.

2. Defendant lied about Jing Li's situation after Plaintiff's discharge. In fact, Jing Li was never assigned for Plaintiff's duties and at the time Jing Li was not able to do Plaintiff's project technically, she left UMMC 6 days after Plaintiff's termination by UMMC's order and someone did resign for her on the employee resign webpage (Lawson). She was even not allowed to collect her own project results.

3. Due to Defendant selectively provided email documents, never provided RIF protocol including the remaining time for email account and lacking of Scientist I gender information which is the basic information for Plaintiff's pursuant of Equal Pay Act, Plaintiff should have a chance to clarify these issues at trial.

Overall, taken all facts together, the motion for its summary judgment should be denied. Plaintiff should at least have a chance to meet with the Judge and at trial.

Respectfully submitted, this the 29th day of January, 2016

shanshan zhan

Shanshan Zhan
1778 Pinetree Rd.
Augusta, GA, 30904
Home: 706 733 4410
Email: shan_zhan@yahoo.com